;

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA-EASTERN DIVISION

| | |
|---|---|
| VICTOR MARTINEZ ROSALES, JR., | ED CV 14-770-SH |
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

This matter is before the Court for review of the decision by the Commissioner of Social Security denying plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income. Pursuant to 28 U.S.C. § 636(c), the parties have consented that the case may be handled by the undersigned. The action arises under 42 U.S.C. § 405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the record before the Commissioner. The plaintiff and the defendant have filed their pleadings (Plaintiff's Brief in Support of Complaint ["Plaintiff's Brief"];

Memorandum in Opposition to Plaintiff's Complaint; Plaintiff's Statement of No Reply), and the defendant has filed the certified transcript of record. After reviewing the matter, the Court concludes that the decision of the Commissioner should be affirmed.

## I. BACKGROUND

On January 31, 2011, plaintiff Victor Martinez Rosales, Jr. filed applications for period of disability or Disability Insurance Benefits and for Supplemental Security Income, alleging an inability to work since September 1, 2009. (See 1 Administrative Record ["AR"] 173-88). On November 2, 2012 (following a hearing on September 6, 2012, see 1 AR 29-64), an Administrative Law Judge ("ALJ") determined that plaintiff had the following severe impairments -- "rotator cuff tendonapathy with impingement syndrome on the left shoulder; right shoulder impingement; and depressive disorder" -- but found that plaintiff was not disabled within the meaning of the Social Security Act. (See 1 AR 10-21).

Following the Appeals Council's denial of plaintiff's request for a review of the hearing decision (see 1 AR 1-3), plaintiff filed this action in this Court.

Plaintiff makes three challenges to the ALJ's Decision. Plaintiff alleges that the ALJ erred in: (1) failing to properly consider the relevant medical evidence of record in assessing plaintiff's residual functional capacity; (2) failing to properly assess plaintiff's and plaintiff's mother's credibility; and (3) failing to properly consider the vocational expert's testimony. After reviewing the matter, the Court concludes that the decision of the Commissioner should be affirmed.

## II. DISCUSSION

**ISSUE NO. 1:**

Plaintiff contends that the ALJ erred in assessing plaintiff's mental residual functional capacity ("RFC").[1] Defendant asserts that the ALJ properly determined plaintiff's mental RFC.

The ALJ found that plaintiff had the ability to perform light work[2] with some physical restrictions. With respect to plaintiff's mental impairment, the ALJ found that plaintiff could sustain concentration, attention, persistence and pace in at least two-hour blocks of time; could perform complex and detailed tasks; could not do jobs with fast-paced production requirements or assembly line work; could respond and interact appropriately with supervisors; could have frequent contact with co-workers; and could not deal with the general public. (See AR 14).

Plaintiff contends that his worsening mental condition was shown by his Global Assessment of Functioning ("GAF") scores assessed by doctors at the Veterans Administration Hospital (see Plaintiff's Brief at 4, citing to 1 AR 354 [On April 13, 2010, plaintiff received a GAF score of 45], 1 AR 441 [On May 14, 2010, plaintiff received a GAF score of 60], 2 AR 530 [On October 6, 2010, plaintiff received a GAF score of 60], 2 AR 799 [On March 30, 2011, plaintiff received a GAF score of 48], 2 AR 864 [On May 31, 2011, plaintiff received a GAF score of 45], 2 AR 924 [On August 26, 2011, plaintiff received a GAF score of 50], 2 AR 907 [On September 25, 2011, plaintiff received a GAF score of 25], 2 AR 976, 979 [On September 26, 2011, plaintiff received GAF scores of 35 and 28], 2 AR 1005 [On December 27, 2011, plaintiff received a GAF score of 50],

---

[1] A Residual Functional Capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b).

3

and 2 AR 991 [On January 24, 2012, plaintiff received a GAF score of 65].[3] However, the ALJ was not required to find a more restrictive mental RFC based solely on plaintiff's GAF scores. See Deck v. Colvin, 2014 WL 7388792, *1 (9th Cir.)(". . . [T]he [GAF] score is used for treatment purposes and not for rating a person's ability to work."); McFarland v. Astrue, 288 Fed.App. 357, *1 (9th Cir. 2008)("The Commissioner has determined the GAF scale 'does not have a direct correlation to the severity requirements in [the Social Security Administration's mental disorders listings.'"); 65 Fed.Reg. 50746, 50764-65 (August 21, 2000).

Moreover, the ALJ's decision to give little weight to plaintiff's GAF scores in the forties because they were "generally assessed during periods of continued drug and medical non-compliance" and because "the record clearly shows that with sobriety and medication adherence, the claimant's mental functioning is stable, with GAF scores in the the 50's and 60's , denoting mild symptoms or difficulty functioning" (see AR 19) was supported by the medical record. (See 1 AR 354-55 [On April 13, 2010 (when plaintiff's GAF score was 45), plaintiff was found to be in early remission of his dependence for methamphetamine, alcohol abuse and marijuana abuse, and plaintiff was starting on a trial of Zoloft and Depakote]; 1 AR 441 [On May 14, 2010 (when plaintiff's GAF score was 60), plaintiff was found to have benefitted from Depakote with respect to his anger/impulse control, and plaintiff reported to abstain from alcohol); 2 AR 530 [On October 6, 2010 (when plaintiff received a GAF score of 60), the plan was for plaintiff to continue with psychotropic medications]; 2 AR 797-99 [On March 30, 2011 (when plaintiff received a GAF score of 48), plaintiff reported he had taken himself off all medications, but he was restarted on his psychotropic medications]; 2 AR 864 [On May

---

[3] "A GAF of forty indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relationships, judgment, thinking, or mood." Bayliss v. Barnhart, 427 F.3d 1211, 1217, n.3 (9th Cir. 2005), citing to Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th TR. ed. 2000).

31, 2011 (when plaintiff received a GAF score of 45), plaintiff admitted to nightly marijuana usage]; 2 AR 906-07 [On September 25, 2011 (when plaintiff received a GAF score of 25), plaintiff was assessed with substance induced mood disorder, and was found to be dependent on methamphetamine, THC and alcohol]; 2 AR 1002-05 [On December 27, 2011 (when plaintiff received a GAF score of 50), plaintiff reported to be compliant with his treatment regime, plaintiff's anger and violence were noted to have improved, and the plan was to continue with his psychotropic medications]; and 2 AR 989-91 [On January 24, 2012 (when plaintiff received a GAF score of 65), plaintiff reported to be compliant with his treatment regime, and the plan was to continue with his psychotropic medications]).

To the extent that plaintiff contends that the ALJ erred in finding that plaintiff could interact with supervisors without limitations and could have frequent contact with co-workers, based on the progress note of an April 26, 2012 incident in which during a fight plaintiff's brother hit plaintiff on the head with a metal object, which resulted in plaintiff suffering lacerations and needing stitches (see Plaintiff's Brief at 4-5, citing 2 AR 1027), there is nothing in the note about plaintiff's fight with his brother that undermines the ALJ's determination that plaintiff could interact with supervisors without limitations and could have frequent contacts with co-workers. There is no indication in that progress note that the fight was relevant to plaintiff's mental condition. See Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995)("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities"); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003)("[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'"). Indeed, when plaintiff testified at the administrative hearing about the fight with his brother, who plaintiff said was schizophrenic (see 1 AR 31), plaintiff portrayed it as a incident related to his brother's violence rather than as indicative of plaintiff having problems interacting with others. (See 1 AR 37, 52-53).

Moreover, as noted by the ALJ (see 1 AR 18), a progress note on April 18, 2012, approximately one week before plaintiff's fight with his brother, reflected that plaintiff's depression was noted as stable.  (See 2 AR 1033).

**ISSUE NO. 2:**

Plaintiff asserts that the ALJ failed to properly assess plaintiff's and his mother's credibility.  Defendant asserts that the ALJ properly found that plaintiff was not fully credible.  Defendant further asserts that the ALJ properly found that plaintiff's mother was only partially credible, and alternatively that any error in assessing plaintiff's mother's testimony was harmless.

    A.    Plaintiff's Credibility

In a Function Report – Adult, dated March 9, 2011, plaintiff stated that he lived in a house with his 80 year-old mother.  When describing his daily activities,  stated he wakes up at 6:30 a.m, goes to class at the Veterans Administration until noon, comes home for lunch, takes medication and goes to sleep until 2 p.m., watches television, eats dinner at 5 p.m., takes medication at 8 p.m., and goes to bed at 9 p.m.  Plaintiff stated he cannot focus or stay awake for long periods of time because of the medication, and his condition makes his toss and turn all night.  Plaintiff stated that he does not have any problem with personal care or taking medication, that he is able to prepare his own meals, that he does laundry and mowed the lawn (with his mother's encouragement), and that every day he leaves the house by driving a car.  Plaintiff stated his hobbies and interests are watching television, which he does every day, that he does not spend time with others, that he does not have any problems getting along with family, friends, neighbors, or others, and that his condition causes him to be more isolated.

Plaintiff stated that his condition affects his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair-climbing, seeing, memory,

completing tasks, concentration, understanding, following instructions, using hands, and getting along with others, and allows him to do only half as much in all areas of daily life. Plaintiff stated that he is left-handed, that he can walk 5 minutes before needing to rest, and can resume walking after 20 minutes of rest, that he can pay attention for 60 seconds, that he cannot finish chores, that he struggles with following written instructions, that he follows spoken instructions okay, that he gets along okay with authority figures, that he has never been fired or laid off from a job because of problems getting along with other people, that he does not handle stress well because he gets angry easily, that he has fear that people are out to get him, and that he wears prescribed glasses all of the time. (See 1 AR 248-55).

At the administrative hearing (on September 6, 2012), plaintiff testified that he is single (he has been divorced for approximately 18 months) and lives with his 83 year-old mother and his brother (who he said was schizophrenic). His last job was in masonry; he worked as a bricklayer for three years, and was laid off in January 2008 due to a lack of work. He tried to look for work after he was laid off, but he stopped looking years earlier since there were no available jobs.

He testified he generally wakes up at 6:45 a.m. and watches the morning news. He spends one hour a week driving to the Veterans Administration Hospital for therapy classes (he was taking one class a week dealing with PTSD and alcohol and drug abuse; he was taking three classes a week until 8 months earlier), appointments and to the gas station. The classes, which have about 10 people in them, are helping him "keep [ ] out of prison or killing somebody."

He testified that he loves to cook, and make meals -- such as tacos, beans and rice, salad -- only for himself; that he takes care of his own personal hygiene needs without assistance; that he does chores such as mowing the lawn and fixing things (his mother does the rest of the chores); that he is able to sweep and mop, even though he experiences

shortness of breath; that his mother does all the shopping; and that he does minor work on cars.

He testified that his hobbies are riding a stationary bike at home (for approximately 10 minutes at a time); that he used to lift weights up to 300 pounds (until March 2012), but he cannot not lift weights any more because of a torn rotator cuff, the medications, and blackouts involving loss of hearing and/or sight and dizziness (he presently lifts 10 pounds with each hand, 6 to 10 repetitions, four times a week); that he last tried using a treadmill three years earlier, but he burned the motor out; and that he watches television, particularly game shows; and that he plays backgammon with a neighbor friend once a week.

When asked about visits with family or friends, he testified that he does not get along with his family (he did not walk his daughter down the aisle at her wedding in April, and he got into a fight with his brother in April which resulted in him going to the hospital and getting ten stitches for his head); that he does not go to birthday parties, and that his only social visit is with his neighbor. He does not belong to social organizations or attend church.

He testified that about three years earlier he tore one of his shoulders when he fell while doing work on his mother's attic, and that about four years earlier he tore his other shoulder while lifting weights.

He testified that since September 1, 2009, he has suffered bad depression. He has wanted to hurt himself, and has had problems with controlling his anger or temper. He has gotten into fights with strangers, including one following a road range incident, and one involving an incident in the psych ward at the Veterans Administration Hospital. He got into a fight with his brother three days before his daughter's wedding. His psychiatric condition has gotten worse the last two or three years. He attributes his worsening condition to depression and PTSD.

He testified he has a hernia. His hernia causes him to suffer acid reflux. As a result of his hernia, his doctor does not want him to lift weights, but did not give him an exact weight (he interpreted it as being restricted to lifting 10 pounds in each hand). He has no present plans to have a surgery on his hernia.

He testified that he no longer has a girlfriend (he went out with her in 2011 for about a year) because they only did drugs together. Plaintiff testified he has had some difficulty with alcohol and drug abuse -- he had attended the Veterans Administration's drug treatment program; he last used methamphetamine about three years ago; and the last time he had alcohol was about 14 months earlier (apparently when he learned he had Hepatitis C). For depression he takes Lithium and Sertraline (Zoloft), which cause him to suffer weight gain, lethargy, and balance issues. In the past year he has gained fifteen pounds due to his taking Lithium. He was supposed to go on Interferon for his Hepatitis the past summer; however, there is nothing in his medical file about it (it was just a discussion he had with his nurse). The Interferon was delayed because of his mental status ("Interferon will put you off in the deep end").

When asked if he could do a job packing pens, rubber bans, paper clips, or cups in a box for eight hours a day (without any social interaction), he testified he could probably do it physically but not emotionally because he would probably get into a fight or quit. He would have a hard time dealing with supervisors, because he would feel he was getting the "crappy job" or was being picked on or singled out. He got fired from several past masonry jobs because he would fight. He was not laid off from his last job; he did not drink during that time, and he did not beat up his workers because he was a foreman. (See 1 AR 30-58).

The ALJ found that plaintiff's "allegations concerning the intensity, persistent and limiting effects of his symptoms are less than fully credible. The allegations of disabling anger problems, depression, and shoulder impairments are inconsistent with the objective

medical evidence, which indicates an attempt by the claimant to exaggerate the severity of his symptoms." (1 AR 16).  The ALJ then stated the following:

> The claimant has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations.  For example, he remains able to prepare full meals, drive, watch television, socialize with a neighbor, attend weekly meetings and classes, mow the lawn, and exercise with a stationary bike.  Some of the physical and mental and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  The undersigned finds the claimant's ability to participate in such activities diminishes the credibility of the claimant's allegations of functional limitations.
>
> It appears from testimony that apart from more than light lifting due to his shoulder injury, he remains able to stand and walk without limitation.  The claimant continues to use a stationary bike every morning and he reported he would continue to walk on the treadmill if it worked.  Further, he acknowledged an ability to perform physically demanding activities like work on cars, mow the lawn, etc. March 20, 2012 doctor's appointment notes reflect that he continued lifting weights.  He admitted he has continued to lift 10 pounds weights in each arm, for six to 10 repetitions, every other day.  The claimant acknowledged he could physically perform a light job, but he does not believe he could perform any job without getting into fights.
>
> The claimant testified he began getting into fights three or four years ago. He stated he is in therapy and attends anger management classes, but he believes they are only helpful to keep from going to prison or hurting someone.  He stated he would be unable to deal with supervisors because he would feel like he is being picked on or singled out.  While there is some evidence of anger problems, there is insufficient evidence to document disabling social limitations.  The claimant

acknowledged he remains able to interact at weekly meetings, attend weekly classes and visit with a neighbor. Further, he is able to interact to the point of being able to play games on a weekly basis. It appears from the record that a limitation to no public contact and only frequent contact with co-workers is sufficient to accommodate the claimant's moderate social limitation.

Finally, the record indicates that the claimant stopped working due to a business-related layoff rather than because of the allegedly disabling impairments. Further, there is no evidence of a significant deterioration in the claimant's medical condition since that layoff. A reasonable inference, therefore, is that the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition. This conclusion is further supported by the claimant's admission that he continued to look for work after being laid off. (AR 16-17).

After discussing plaintiff's mother's testimony (see AR 17), the ALJ stated: "After careful consideration of the evidence, the undersigned finds that the claimant's medical determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 17).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms. Smolen v. Chater, 157 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating

clear and convincing reasons for doing so. <u>Smolen v. Chater</u>, <u>supra</u>; <u>see</u> <u>also</u> <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998); <u>Light v. Social Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997).

Here, substantial evidence supported the ALJ's finding that plaintiff's testimony about the intensity, persistence and limiting effects of the symptoms was not fully credible.[4]

One reason given by the ALJ -- plaintiff's ability to perform daily activities such as prepare meals, drive, mow the lawn, work on cars, watch television, socialize with a neighbor, attend weekly meetings and classes, exercise with a stationary bike, lift weights, supported the ALJ's credibility finding. Such activities are inconsistent with plaintiff's claimed inability to perform any work. See <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012)(". . . [T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . . . Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of totally debilitating impairment."); <u>Morgan v. Commissioner of Social Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations.")

Moreover, another reason given by the ALJ -- the inconsistency between plaintiff's testimony that he cannot engage in social interaction and his testimony that he attended weekly meetings and classes and played chess regularly with a neighbor -- was supported by the record. See <u>Light v. Social Security Admin.</u>, 119 F.3d 789, 792 (9th Cir.

---

[4] The Court will not consider reasons for finding plaintiff not fully credible (see Defendant's Brief at 4-5) that were not given by the ALJ in the Decision. See <u>Pinto v. Massanari</u>, 249 F.3d 840, 847-48 (9th Cir. 2001); <u>SEC v. Chenery Corp.</u>, 332 US 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

1997)("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between her testimony and his conduct, his daily activities, his work history, and testimony from physicians and third parties concerning the nature, severity, and effect on the symptoms of which he complains.").

Moreover, another reason given by the ALJ -- that there was a lack of evidence supporting plaintiff's testimony that he significantly deteriorated the last two or three years – was also supported by the record. See Cotton v. Bowen, 799 F.2d 1403, 1406 (9th Cir. 1986)("[T]he Secretary may decide to disregard [a claimant's pain] testimony whenever the claimant fails to submit objective medical findings establishing a medical impairment that could reasonably be expected to produce the claimed pain."); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998).

Contrary to plaintiff's assertion (see Plaintiff's Brief at 6), plaintiff's GAF scores do not show a worsening in plaintiff's mental condition, as discussed above. Moreover, there simply is nothing in the medical record discussed by the ALJ indicating that plaintiff is unable to interact with supervisors or co-workers. (See 1 AR 17-19).

B. Plaintiff's Mother's Credibility

In a Function Report – Adult – Third Party, dated March 9, 2011, plaintiff's mother, Mary Rosales, stated that she spends a lot of time with plaintiff because he lives at home. With respect to daily activities, she stated that plaintiff gets up at 6:30 a.m., eats, goes to the Veteran Administration's Hospital for class, comes home at noon, eats lunch, takes medication, and sleeps. She stated that because of plaintiff's condition he can no longer work or do reports and sleeps poorly. She stated that plaintiff has no

problem with his personal care, that plaintiff is able to prepare his own meals, and that plaintiff is able to do laundry and mow the lawn (but she has to remind him to do them), She stated that plaintiff drives a car every day.  She stated that plaintiff does not shop or pay bills because he does not have money.   She stated that plaintiff's hobbies and interests are watching television.  With respect to social activities, she stated that plaintiff does not spend time with hours, and that he goes to the Veteran Administrations Hospital four days a week for one hour, that he does not have any problems getting along with family, friends, neighbors, or others, and that plaintiff is "more sad" since his condition began.  She stated that plaintiff's condition affects his abilities to lift, bend, kneel, memory, completing tasks, concentration, understanding, and following instructions, and that he can do only half as much.  She stated that plaintiff can walk 5 minutes before needing to rest, that he can resume walking after 20 minutes, that he can pay attention for one minute, that he does not finish what he starts, that he struggles with following written instructions, and that he follows spoken directions okay, that he gets along okay with authority figures, that he has never been fired or laid off because of problems getting along with other people, that he does not handle stress well, that he and that he is slow in handling changes in routine.  When asked if she noticed any unusual behavior or fears in plaintiff, she stated "they are out to get him."  (See 1 AR 256-63).

The ALJ addressed plaintiff's mother's Function Report as follows:

> . . . [T]he undersigned has read and considered the third party function report completed by the claimant's mother and find her to be only partially credible for the reasons discussed herein (Exhibit 5E).  While the claimant's mother reported he has trouble sleeping, needs reminders, is sad, and cannot perform many of the physical activities that he used to perform, she also acknowledged his continued ability to prepare meals, drive, care for his own hygiene needs without assistance, attend weekly meetings, and more (*id*).  While it is true that the claimant cannot perform some of the physical activities he used to perform including heavy work

14

duties and lifting heavy weights, he remains capable of performing light work. Further, the social interaction limitations included in the maximum residual functional capacity assessment are sufficient to accommodate the claimant's moderate social interaction difficulties. (1 AR 17).

Here, the ALJ gave germane reasons for finding plaintiff's mother's testimony only partially credible. See Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006); Smolen v. Chater, supra, 80 F.3d at 1288-89. The ALJ properly found that plaintiff's mother's testimony about plaintiff's daily activities and inability to work, which essentially mirrored plaintiff's testimony, was inconsistent with plaintiff's ability to perform light work with the limitations for interacting with the public and co-workers. See Carmickle v. Commissioner, supra (holding that an inconsistency with the plaintiff's conduct is a germane reason for rejecting lay witness testimony); Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)(holding that inconsistency with the medical evidence is a germane reason for discrediting the testimony of a lay witness).

**ISSUE NO. 3:**

Plaintiff asserts that the ALJ improperly determined that plaintiff could perform the work of a cleaner, office helper and carton package machine operator, since the ALJ found with respect to plaintiff's RFC that plaintiff could only "occasionally reach overhead with the left dominant upper extremity" (AR 14). Defendant argues that the ALJ properly found that plaintiff could perform such work.

Given a hypothetical question containing all of the limitations found by the ALJ, including the ability to only occasionally reach with the left dominant extremity, the ALJ found that such an individual would be able to perform the following work in the national economy: cleaner (Dictionary of Occupational Titles ["DOT"] 323.687-014), office

helper (DOT 209.667-014), and carton machine operator (DOT 920.665-010). (See AR 59-61).

The ALJ properly relied on the vocational expert's testimony that a person with plaintiff's RFC could perform the jobs of cleaner, office helper, and carton machine operator, using descriptions consistent with the DOT (see 1 AR 20-21). See 20 C.F.R. § 404.1560 (b)(2); 20 C.F.R. § 404.960(b)(2). Although the cleaner and office helper jobs require frequent "reaching" and "handling" (see DOT 323.687-014, 209.667-014: Plaintiff's Brief, Exhibits A and B) and the carton machine operator job requires constant "reaching" and "handling" (see DOT 920.665-010; see Plaintiff's Brief, Exhibit C), there is nothing in the descriptions of cleaner, office helper or carton machine operator requiring reaching with both extremities, and plaintiff was not given any restrictions in his ability to reach overhead or to engage in gross manipulation with his right arm (see AR 14). See Gutierrez v. Astrue, 2012 WL 234366, *2 (C.D. Cal. 2012)("And, generally speaking, the requirement that an employee frequently use his hands to perform a job does not mean that he has to be able to use both hands."). Thus, contrary to plaintiff's assertion, the jobs of cleaner, office helper and carton machine operator are not inconsistent with plaintiff's RFC, and the ALJ did not err in finding that plaintiff could perform such jobs.

## ORDER

For the foregoing reasons, the decision of the Commissioner is affirmed.

DATED: January 28, 2015

_____
STEPHEN J. HILLMAN
UNITED STATES MAGISTRATE JUDGE

16